SAM GOLDFARB PLYMOUTH, INC., a
Michigan Corporation, Plaintiff,

v.

CHRYSLER CORPORATION, a Delaware
Corporation, Defendant.

Civ. A. No. 22570.

United States District Court
E. D. Michigan, S. D.

June 29, 1962.

Ivan E. Barris, Leonard Lemberg, Detroit, Mich., for plaintiff.

R. William Rogers and John A. Ziegler, Jr., of Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for defendant.

MACHROWICZ, District Judge.

This Court has carefully reviewed the transcript of the testimony presented at the hearing on the preliminary temporary injunction in this matter on June 14th and June 15th, 1962, and also the briefs filed by counsel for the plaintiff and the defendant.

The plaintiff brings action under the "Dealer's Day in Court Act", 15 U.S.C.A. §§ 1221–1225, which authorizes suits by dealers against automobile manufacturers for

> "damages * * * sustained * * * by reason of the failure of said automobile manufacturer * * * to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer."

In these proceedings he seeks a temporary injunction enjoining and restraining the manufacturer from

> "in any manner engaging in unfair or inequitable conduct constituting coercion, intimidation or threats thereof either in performing or complying with the terms of the franchise contract between the parties or in terminating same."

Inasmuch as the manufacturer defendant has served notice upon the plaintiff dealer that he intends to terminate the franchise contract on July 6, 1962, for alleged breach thereof, both parties urge

the Court for early action on the request for temporary injunction.

In its reply brief in opposition to the application for temporary injunction, the defendant claims that it is terminating its dealer agreement with the plaintiff in good faith because the plaintiff "failed to perform the sales requirements established by that contract". On the other hand, the plaintiff claims that the real reason for the threatened termination was plaintiff's dealing in foreign cars which are products of some of the defendant's competitors.

The testimony shows that the plaintiff has been in the business of selling foreign cars since June 1, 1959, and still continues to sell them. In August or September, 1960, he entered into negotiations for handling cars manufactured by the defendant and on September 22, 1960, a written franchise agreement was entered into between the plaintiff and defendant. In the agreement, which was received as an exhibit in these proceedings, no mention was made of discontinuing the sales of the foreign cars, but a written notice of termination of such sales was signed by the plaintiff, addressed to the foreign manufacturers, and delivered to the officers of the defendant corporation. Plaintiff alleges that he was told by one of these representatives of the defendant that he "could not have them (the foreign cars) under one roof, and * * * discussed the possibility that if the Plymouth-Valiant deal went well, that I would eventually give up the foreign cars." He further alleges that he was then told that if he "didn't sign them (terminations) there would be no deal." Subsequently, about two or three weeks later, he signed at the defendant's request, new terminations with the line "due to my agreement with Chrysler Corporation" deleted.

It is conceded that the defendant never forwarded the notices to the foreign manufacturers and that they still are in the defendant's files, also that plaintiff still sells the cars of the foreign manufacturers. No testimony has been presented indicating that the defendant at any later time pressed the plaintiff to terminate his contracts with the foreign manufacturers, although plaintiff did testify that he cautioned the defendant that he would notify the proper Federal authorities if defendant sent the notice to the various foreign car distributors.

Defendant contends that it acted in good faith in acting to terminate its franchise agreement with the plaintiff and that it was motivated only by the plaintiff's failure to live up to the "minimum sales responsibility" terms of the contract. These terms are very specifically set forth in paragraph 7 of the agreement. Paragraph 21 of the agreement gives the defendant manufacturer the right to

"terminate this agreement on not less than ninety (90) days written notice on the failure of the dealer to perform fully any of his undertakings and obligations in Paragraphs 7 through 10 of this agreement."

Admittedly defendant has followed this procedure as provided for in the agreement.

The provisions of Paragraph 7 of the agreement which were standard throughout the country, provided for the plaintiff dealer to sell a number of cars monthly representing a fair share of cars sold in the Detroit metropolitan area, this number being related to the average performance by all dealers handling the same product in the area. The formula took into consideration the rise and fall of the automobile market generally and the defendant's products in particular. The formula also took in consideration the fact that the plaintiff operated in Dearborn, an area dominated to a great extent by one of the defendant's chief competitors and eliminated fifty percent (50%) of the Dearborn total sales in the calculation, thereby reducing significantly the quota charged to the plaintiff.

Uncontroverted testimony indicated that plaintiff's performance was far below the Minimum Sales Responsibility provision of the contract. For the three months of 1960, when plaintiff first op-

erated under the contract, his sales performance was only approximately forty-one percent (41%) of that provided in the contract. In 1961 it was only about thirty percent (30%) and plaintiff ranked twenty-seventh (27th) of the twenty-seven (27) dealers of defendant's products in the area. In the first months of 1962 it was about forty-eight and five-tenths percent (48.5%) and plaintiff ranked among the lowest in performance among defendant's dealers in the area. Never during the approximately sixteen (16) months of the period during which the plaintiff operated under the contract, did he reach as much as fifty percent (50%) of the contractual obligation assumed by himself.

The testimony also shows that other dealers of defendant's products who failed to reach the quota allotted to them, some of them having a more satisfactory performance record than plaintiff, received termination notices or their contract was already terminated.

Under these facts, it is difficult to assume that there was any discrimination or coercion used against the plaintiff or that there was evidence of bad faith on its part, particularly since plaintiff still continues after sixteen (16) months to deal in foreign cars to the same extent as before the present contract was entered into, and will probably continue to do so without interference from the defendant. The terms of the contract appear to be reasonable and fair and must have been so considered by the plaintiff when he agreed to them.

The Court therefore holds that the defendant was within its rights to exercise the option under the contract to act to terminate the agreement for plaintiff's failure to meet his Minimum Sales Responsibility, which provision cannot be termed unreasonable or discriminatory. The evidence fails to sustain the claim that the plaintiff's handling of foreign cars was the reason for defendant's action of termination. It does not meet the burden of proof required to show that defendant had acted in bad faith so as to justify the issuance of a preliminary injunction as requested.

It is unnecessary to consider defendant's contention that a temporary injunction is not authorized under the "Dealers' Day in Court Act," as this motion can be determined on other grounds, as set forth above.

In Staten Island Motors, Inc., v. American Motor Sales Corp. (D.C.N.J.1959), 169 F.Supp. 378, the Court held that this Act

"does not prohibit a manufacturer from terminating or refusing to renew the franchise of a dealer who fails to provide adequate representation, nor does the [Act] curtail a manufacturer's right to cancel or not renew an inefficient or undesirable dealer's franchise, nor does the Act freeze present channels or methods of automobile distribution."

In Leach v. Ford Motor Co. (D.C. Cal.1960) 189 F.Supp. 349, the Court said:

"Assignment of a market potential in the course of honest business judgment by a manufacturer to a dealer as a measure of expected performance within an area is not inherently unfair or arbitrary. * * Only if the percentage factor for any one dealer is out of line could he be prejudiced by the so-called market potential formula."

In the absence of sufficient evidence to the contrary, the Court must assume the formula to have been reasonable.

Even in the case of Bateman v. Ford Motor Co., 3 Cir., 302 F.2d 63, relied upon by the plaintiffs, the Court said:

"A franchise is not a marriage for life. And if a termination turns out to be made, in the statutory language, 'in good faith,' the dealer is certainly entitled no longer to protection. Further, within the terms of the contract and the statute, the manufacturer may terminate the contract if he acts in good faith. No protection should extend longer

than the termination made in good faith."

It is interesting to note that although in the Bateman case, supra, the Third Circuit Court of Appeals held that the District Court had the power to issue a temporary injunction, on a further hearing, the District Court, 204 F.Supp. 357, in a situation in many respects similar to the present case, denied a temporary injunction on the same grounds as cited here, namely that

> "plaintiff failed to meet the burden of proof by showing bad faith, coercion, discrimination or threatened irreparable harm warranting the issuance of a preliminary injunction under law."

The plaintiff is undoubtedly correct in stating that it is not necessary that a plaintiff's right to a final decision be absolutely certain if he has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and for more deliberative investigation. This Court fully concurs with the logic and reasoning of the excellent opinion of Judge Theodore Levin, Chief Judge of this District, in Briggs Manufacturing Co. v. Crane Co., D.C., 185 F.Supp. 177 (1960). But in that case Judge Levin held specifically that

> "there is a reasonable probability of violation of Section 7 of the Clayton Act."

If the evidence here showed such reasonable probability of violation of the Act in question, a temporary injunction might lie. The plaintiff, however, has failed to deny that he has substantially violated the provisions of the agreement which authorized the defendant to terminate it. Even though all allegations relative to the foreign car sales were proven, this would not deprive the defendant of its clear right to revocation for these violations.

It has always been held that the discretionary power of granting a preliminary injunction must be exercised with great caution. Murray Hill Restaurant v. Thirteen Twenty-One Locust, 98 F.2d 578 (3rd Cir., 1938).

The Court finds as a fact that plaintiff has not proven bad faith, coercion, discrimination or such threatened irreparable harm as to warrant the issuance of the requested preliminary injunction. In making this finding the Court in no way is passing on the merits of plaintiff's action for damages resulting from the various acts alleged in his complaint. This determination will have to await the trial of this case on its merits.

Accordingly, this Court rules that the order to show cause and the petition for preliminary injunction are denied.