LENA LUFTIG and LIZIE LUFTIG, Respondents, *v.* TRAVELERS INSURANCE COMPANY, Appellant. (Action No. 1.)

LENA LUFTIG and LIZIE LUFTIG, Respondents, *v.* TRAVELERS INSURANCE COMPANY. Appellant. (Action No. 2.)

First Department, March 18, 1938.

*Bernard J. McGlinn* of counsel [*Louis P. Galli, William J. Moran* and *William B. Crowell* with him on the brief; *Moran, Galli & McGlinn,* attorneys], for the appellant.

*Henry Lehrich* of counsel [*Hyman D. Lehrich* with him on the brief; *Lehrich & Lehrich,* attorneys], for the respondents.

DORE, J.   Defendant appeals from two judgments aggregating $51,682.92 entered in plaintiffs' favor in two actions based upon two policies of insurance issued by defendant.   The material allegations of the pleadings and the issues tried are the same in both actions except that each action relates to a separate policy of life insurance for the face amount of $25,000, one issued May 15 and the other May 20, 1929, to one Moe S. Luftig.   Both policies contained the same provisions for waiver of premium in the event of permanent total disability, and as such provisions are the only ones at issue we shall for convenience refer to the policies in the singular number.

It is conceded (1) that during the lifetime of the insured defendant never received any notice, claim or proof of disability; (2) that the premiums due on one policy were not paid after February 15, 1934, and on the other after May 20, 1935; and (3) that the insured died May 12, 1936.

Plaintiffs at the trial and on this appeal contend that by reason of the total permanent disability of the insured existing continuously from February 1, 1933, until the date of death on May 12, 1936, the company under the provisions of the policy waived all premiums which fell due during such period; that accordingly there was no default; and that the plaintiffs established these facts by a preponderance of the credible evidence, and as beneficiaries were entitled to recover the full benefits.

Defendant contends that plaintiffs failed to sustain the burden of proving that the insured was, during the period claimed, totally and permanently disabled; that the verdict of the jury was against the weight of the credible evidence; and that under the policy due proof of total disability was required to be submitted to defendant during the lifetime of the insured, and as no such proof was offered, the trial court should have granted defendant's motions to dismiss and its motion for a directed verdict.   These motions were denied, with appropriate exceptions to defendant.

Plaintiffs rely on the following clause which they claim is unique in this policy and which the defendant states has never been con-

strued by this court: " Upon presentation of a valid death claim under this contract if it shall appear that such total disability began before the anniversary of the contract nearest the sixtieth anniversary of the date of birth, and existed continuously up to the date of death, failure to pay any premium falling due within the period of such disability will not be held to be a default; such premium will be waived and if paid will be refunded to the Beneficiary."

Under the terms of this paragraph plaintiffs contend that no notice of disability was required during the lifetime of the insured, and that this clause differentiates the case from others relied on by defendant in which notice was held requisite. The trial court adopted plaintiffs' construction and charged the jury solely on the above-quoted clause of the policy, instructing the jury that if the insured incurred a total and permanent disability in February, 1933, which continued until the date of his death, the jury must find for plaintiffs, and if he did not, the jury must find for defendant.

Plaintiffs' contention and the court's construction of the contract might well be correct if the clause above quoted were the only reference in the policy to the provisions for waiver of premium in case of total disability. But that is not the case. The entire policy must be examined and all its clauses relating to waiver of premium on disability read together. At the very outset of the policy, immediately after the defendant's agreement to pay the face amount on receipt of due proof of death of the insured during the continuance of the contract, we find the following clauses relating to the payment of premiums and the waiver thereof:
" Premium
" This contract is issued in consideration * * * of the premium, payable as hereinabove stated, * * *.
" When Payable
" The first such payment shall be made on the delivery of this contract, and a like payment on or before the dates specified above for premium payments in each year during the continuance of the contract, but no such payment will be required during permanent total disability *after receipt by the Company of due proof thereof."* (Italics mine.)

Thus at the very beginning of the policy and in connection with the provisions for payment of premiums we find a clause which expressly and without limitation provides generally that receipt by the company of due proof of permanent total disibility is a condition for the waiver of premiums.

But this is not all. The policy further provides that the contract is subject to " the privileges and conditions recited on the subsequent pages hereof," and the subsequent pages after setting forth

various privileges relating to cash and loan values, paid up insurance, etc., has the following relevant provisions:

" PREMIUM WAIVER IN EVENT OF PERMANENT TOTAL DISABILITY

" *Upon due proof submitted during the lifetime of the Insured* that since the payment of the initial premium upon this contract, before a default in the payment of any subsequent premium, and before the anniversary of this contract nearest the sixtieth anniversary of the date of birth, the Insured has become wholly disabled by bodily injuries or disease and will be continuously and wholly prevented thereby for life from engaging in any occupation or employment for wage or profit, * * * the following benefits will be allowed: "

1. Waiver of premiums during such disability.

2. Premiums waived will not be deducted in case of any settlement under the contract.

3. Loan and paid-up insurance values will be kept intact.   (Italics mine.)

Immediately following these provisions and under the same general caption there then appears the paragraph first above quoted on which plaintiffs rely, which states in effect that on presentation of a valid death claim, if it appear that total disability began before the age of sixty and existed continuously to death, the failure to pay any premium within the period of such disability will not be held a default.

Obviously this clause cannot be read alone as if it were the only provision respecting waiver of premium in the event of total disability, nor can it be read torn from its context and detached from the other provisions immediately preceding it relating to the same topic, grouped under the same general heading and expressly requiring due proof of disability during the life of the insured. In construing the contract the nature of the policy itself must be kept in mind.   This is not a policy providing for payment by the company to the insured in his lifetime of any disability benefits whatever.   It is strictly a life insurance policy denominated in the contract itself " Whole Life Contract, Premiums Payable for Life," under the terms of which the company is not obliged to pay any Insurance whatever to the beneficiaries until after the insured's death.   Keeping that fact in mind the purpose of the clause on which plaintiffs rely becomes clear.   In the first provision relating to waiver of premium at the very beginning of the policy the insured was told one of the special advantages of this particular policy, viz., that if he suffered permanent total disability he would no longer be required during his life to pay any premiums " after

receipt by the Company of due proof " of such permanent total disability. In the subsequent provisions relating to the same topic, the policy gives further detailed information of this special privilege. What the company will waive is specifically itemized, but for a second time the insured is informed that this waiver is conditioned upon " due proof submitted during the lifetime of the Insured " of the permanent total disability on which the waiver is predicated. As, however, the policy was a death benefit policy there was then added the final clause under the same heading as the prior paragraph and clearly to be read with it, informing the insured what the company would do about the most important thing the insured was interested in, namely, the payment to his beneficiaries after his death in case he had suffered total and permanent disability that continued till he died. By that clause the insured is told that after his death upon presentation of a valid death claim, if it appears that " such total disability " began before he was sixty and existed continuously to the date of death, his failure to pay any premium falling due within such period would not be held a default, the premium would be waived or refunded to the beneficiary. It is to be noted that the final clause cannot be understood if read alone. It refers in one place to " such total disability " and in another to " such disability." The demonstrative adjective used has backward reference to the total disability that had just been defined in the paragraph immediately preceding which expressly required " due proof submitted during the lifetime of the Insured."

Although the policy was drawn by the company and is to be construed most strongly against it, that rule applies in case of an ambiguity in the provisions. In this case the policy, read as a whole as it should be read, is clear in its provisions relating to the topic in question; in two separate places it expressly requires due proof of disability during the lifetime of the insured. It can be read otherwise only by taking one clause wholly out of its immediate context and construing it as if that were the only provision relating to the matter at issue. Further, a contract should not be construed so as to place one party wholly at the mercy of the other. The trial court's construction did that very thing, as this case abundantly proves. With no notice whatever before death of any claim of disability, the company had no opportunity to examine the insured to ascertain if the claim was a *bona fide* one, and accordingly on the trial was powerless to produce any medical testimony whatever to dispute the claim made for the first time four months after the insured's death when even an autopsy would probably be worthless.

We conclude, therefore, as a matter of law that under the proper construction of the contract and in view of the conceded facts with regard to the time when any claim of disability was made, the judgments must be reversed and the complaints dismissed.

We are also of the opinion, after a careful review of the record, that the jury's verdict was against the weight of the credible evidence and may not be allowed to stand. Plaintiffs' testimony consisted of one medical witness who had signed the physician's statement and two other witnesses, Benjamin Freeman, the accountant for the DeWitt Hat Company, with which the insured was connected as general manager, and the other the designated beneficiary of both policies at the date of the insured's death, the mother of the insured, Lizie Luftig. Freeman testified that prior to February, 1933, the insured was regularly at his place of business but thereafter he was not, that he knew he had no business at any place, and testified to the utter inability of the insured to work or even to walk or to talk. The manifest untruth of this witness' testimony was proved when on cross-examination he was forced to admit that he saw the insured in court in 1935 testifying before a referee, that for some time after February 1, 1933, the insured received a salary of seventy-five dollars a week from the DeWitt Hat Company, and that on the hearing before the referee this witness had testified that Luftig received seventy-five dollars a week up to the time he went out of business. The DeWitt Hat Company went out of business sometime around May or June, 1933. It was also shown that the insured on August 28, 1933, verified bankruptcy schedules, his signature appearing therein seventeen times, and made " solemn oath that he is the secretary of H. Luftig & Son, Inc.," the bankrupt corporation.

Lizie Luftig testified that in February, 1933, the insured had heart attacks, that he would not get up until about twelve o'clock in the day, that she had always to accompany him in going out, that " He couldn't breathe at all; " that a day did not pass that he did not get an attack and that he never went to business.

The record, however, conclusively shows from the insured's own statements, acts and conduct that he did not consider himself and was not during the period claimed, totally and permanently disabled so as to be prevented from engaging in any occupation or employment for wage or profit. Numerous exhibits introduced by defendant relating to the insured's business transactions after the alleged disability is claimed to have begun indicate much more than plaintiffs concede, namely, the mere ability of the insured to sign his name; they indicate his ability to attend to his affairs and transact business involving the kind of work that most business

men, not engaged in manual labor, perform during business hours. Further it was established that the insured obtained employment and received a substantial salary from June, 1935 — two years after the total disability claimed — up to the very time of his death in May, 1936. The president of Handi-Man Company, contractors engaging in the business of window and office cleaning, testified that the insured was associated with the Handi-Man Company in the capacity of a solicitor, and the bookkeeper of that company testified without contradiction that he received for his services " per month " in June, 1935, $80; July, $160; August, $200; September, $160; October, $160; November, $185; December, $160; January, 1936, $200; February, $160; March, $160; April, $40; May, $38.75. This was at an average rate of $40 a week and continued to the very month of the insured's death. Plaintiffs attempt to explain this by evidence adduced on cross-examination that the president of the Handi-Man Company gave the insured the position at the request of a Mr. Rosenthal, the president of a large real estate management business, who controlled many buildings; that Rosenthal did this solely as a friendly act and for the purpose of getting income for Mr. Luftig and not work; that Rosenthal gave the cleaning contracts to the Handi-Man Company with the understanding that it would pay the insured a drawing account; and that Luftig did no window cleaning, had no fixed hours, and the company, under the arrangement with Rosenthal, was willing to pay him regardless of the time he put in. Rosenthal, however, testified that he got the insured the " job " and believed he worked up to close to the time of his death; that he saw the insured frequently and gave him prospects; that the insured got some outside business, told him he called on people, took them to lunch and so forth; that subsequently to February, 1933, he went out with him to restaurants, theatres, night clubs and prize fights. It clearly cannot be said that one who was earning the fairly substantial remuneration indicated above was during the time he was earning it totally and permanently disabled and prevented from engaging in any occupation for wage or profit.

The insured was not a simple, illiterate person but a capable and alert business man who was quoted by one witness as having stated that in 1929 he was " the largest manufacturer of ladies' hats in the city." When he took out these policies he knew the special advantages they contained regarding waiver of premium in case of total permanent disability. Indeed the record shows that in 1932 the nature of these provisions was gone over between him and the cashier of the defendant's branch office at Forty-second street in New York. The claim made on the trial was that from

February, 1933, to his death he was totally incapacitated and that in February, 1933, he was so informed by his physician. Nevertheless, it is undisputed in spite of this alleged total disability, his knowledge of it, and the terms of the policy understood by him, the insured even when hard pressed for funds continued after February, 1933, to make payments of substantial premiums on both policies. He admittedly thereafter paid eight quarterly premiums on one of the policies totaling $1,178, continuing such payments until May, 1935, two years after the commencement of the claimed total and permanent disability; and on the other policy he paid three quarterly premiums totaling $465.75, to February, 1934, a year after the commencement of the claimed disability. On the dates in question it is conceded that the payments of premiums stopped. Neither at said dates nor at any other time during the three years of alleged total disability did the insured make any claim whatever that by reason of his condition he came within the provisions of the policy requiring the company to waive the premiums and keep the policies alive. It is incredible that a man of his alertness and business acumen would have so acted if he were in fact totally and permanently disabled.

This conclusion is corroborated by a great amount of other testimony including the documentary evidence adduced by the defendant. Thus in December, 1933, ten months after the claimed total disability, the insured applied to the Connecticut Mutual Life Insurance Company to reinstate a policy that had lapsed, and stated among other things, " I am now in sound health," that since the due date of the premium in default (November, 1933) " I have had no illness, injury or impairment of health," and he further declared that the information given " is true and full." Again, in March, 1934, over a year after the alleged total disability, the insured made an application to the Connecticut Mutual Life Insurance Company for reinstatement of a policy that had lapsed for non-payment of premiums due on February 14, 1934, and as a consideration for such reinstatement declared " that I am now in sound health; that since the due date of the premium now in default I have had no illness, injury or impairment of health." Additional " most important and conclusive items of evidence " (*Garms* v. *Travelers Insurance Co.*, 242 App. Div. 230; affd., 266 N. Y. 446), also documentary in form, were the insured's applications for renewal of automobile operator's licenses made to the Bureau of Motor Vehicles in 1933, 1934 and 1935 in which the insured denied having any physical disability that would interfere with the safe operation of a motor vehicle. These documents

establish that the insured considered himself at the time not to be permanently and totally disabled and fully capable of operating a motor vehicle. Indeed it was shown that on February 23, 1934, under oath before an official referee of the Supreme Court in alimony proceedings his wife (one of the plaintiffs herein) had instituted against him, the insured testified that his wife had turned over to him a Cadillac automobile which he had operated for three months until it was stolen. It is conceded that the three months were during the period of alleged permanent and total disability. Nevertheless one of the plaintiffs, Lizie Luftig, mother of the insured, testified on this trial that the insured had never operated a motor car after February, 1933, and that he could not do so.

Two years after the commencement of the alleged total disability, in an application which the insured made in February, 1935, for a reduction of weekly alimony payments to his estranged wife, the insured testified that he went out every single morning before nine A. M. looking for work, that he was " doing everything — collecting rents," and although in that proceeding he was desperately endeavoring to prove that he could not pay the alimony allowed to his wife, it is conceded that he made no statement or claim whatever about suffering from heart trouble or being totally and permanently disabled, whereas if he established such facts he would clearly be entitled to a reduction or even the complete extinguishment of alimony payments. Plaintiffs offered no testimony in rebuttal. The plaintiff Lena Luftig, the insured's wife, to whom some months after the insured's death his mother had transferred one-half of her share of the proceeds of the insurance, did not take the stand at all.

Plaintiffs point out that the only medical testimony in the record is that adduced by the plaintiffs and that not a word of medical testimony was adduced by defendant to challenge or question the plaintiffs' medical proof. In view of the fact that the insured gave defendant no notice whatever of any claim of disability during his life and that the very first intimation of any such claim was made in proofs of death filed four months after the insured's death, it is not remarkable that the defendant was wholly unable to adduce any medical testimony. In addition, the medical testimony adduced by plaintiffs was discredited by statements which plaintiffs' doctor made in writing and under oath in other exhibits introduced in evidence by the defendant in which the doctor had signed or verified statements at variance with the testimony he gave on this trial as to the incidence and time of the alleged total and permanent disability. These documents consisted of physicians' affidavits or statements annexed to proofs of death submitted to insurance companies in

connection with insurance held by the deceased. In an effort to explain discrepancies the witness stated that one of these documents sworn to thirteen days after the insured's death was made by his nurse and that she must have made a mistake in stating that the symptoms of the disease first appeared " about a year ago " (*i. e.*, May, 1935). The quality of this witness' testimony can be indicated by the fact that in a further effort to explain this mistake he said he was in the habit of signing papers of that kind without reading them. The papers he signed or swore to without reading were physicians' affidavits or statements in connection with proofs of death on the basis of which insurance companies were expected to pay substantial sums of money.

While this witness categorically stated on direct examination that he found the insured suffering from coronary thrombosis in February, 1933, by reason of which he was then totally and permanently incapacitated and that he at that time so informed the insured, it was shown on cross-examination that he had made no entry whatever in his records that the insured was suffering from coronary thrombosis until October 5, 1935, though he stated he knew that that was the disease from his own recollection and from the nature of the medication prescribed, a notation of which he had made. It will also be noted that after the insured's visit to this doctor in February, 1933, at which time it is claimed he was totally disabled by a serious disease, permanent and progressive, the next visit took place in September, 1933, and the doctor did not again see the insured until two years thereafter, namely October, 1935.

Before the plaintiffs could recover even on their own theory as to the construction of the policies in question, they had the burden of proof to establish that the insured was, from the date claimed, totally and permanently disabled by bodily disease and continuously prevented thereby for life from engaging in any occupation or employment for wage or profit. (*Garms* v. *Travelers Insurance Co.*, 242 App. Div. 230; affd., 266 N. Y. 446; *Finkelstein* v. *John Hancock Mut. Life Ins. Co.*, 247 App. Div. 74; *Elenberg* v. *Metropolitan Life Ins. Co.*, 251 id. 443.) On this record it is clear the plaintiffs wholly failed to sustain such burden and the jury's verdict was accordingly against the weight of the evidence. The facts in this case so completely distinguish it from the facts in cases relied on by plaintiffs that it is unnecessary to discuss those authorities.

From all of the above it follows that the judgment in each action should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., and COHN, J., concur; GLENNON and CALLAHAN, JJ., dissent and vote for a new trial.

CALLAHAN, J. (dissenting). I dissent from the holding that the complaint should be dismissed, for the reason that I disagree with the construction placed on these policies in the majority opinion.

The policies provide for waiver of premium in two classes of cases: *First*, upon proof of disability submitted during the lifetime of the insured, and *second*, upon presentation of a death claim under the policies by the beneficiaries. To support a claim for waiver made during the lifetime of the insured, the policies required that proof of total permanent disability must be given before default occurs in the payment of a premium. As to a claim made by a beneficiary after the death of the insured, the policies provide that failure to pay any premium falling due during a period of total disability which continues to the death of the insured, shall not be held a default, and that such premium shall be waived. No specific requirement for proof of disability during the lifetime of the insured is contained in that clause of the policies relating to claims by beneficiaries.

Clearly an additional insurance feature was intended to be provided by the agreement to waive any default in the payment of premiums during the last illness of the insured. If proper proof of disability had been given during the lifetime of the insured before a premium fell due, no default would have occurred in connection with the non-payment of such premium. Unless, therefore, the additional clause is to be rendered meaningless, it must be construed so as to eliminate the requirement for notice before default.

While there may be some doubt as to whether the phrase " any premium," as used in the clause relating to claims by beneficiaries, was intended to relate to a single premium, or to more than one premium, this doubt should be resolved in favor of the insured.

I agree, however, with the majority view that the proof was insufficient to show continuous total disability within the meaning of the policies after February, 1933.

The judgments should be reversed and a new trial ordered.

GLENNON, J., concurs.

Judgments reversed, with costs, and complaint dismissed, with costs.